WARREN BROWN v. MARCUS D. L. SIMPSON.

*Error from Leavenworth County.*

The decision in *Simpson* v. *Mundee and Brown* [3 Kans., 172], in effect that:

The recording of an unacknowledged deed is sufficient to charge subsequent purchasers with notice of its contents; and

The doctrine of *vendor's lien,* as administered in England, is repugnant to the law of Kansas, and not a part of it; *confirmed.*

The principal questions involved in the case, grew out of these facts: Brown executed, and, on Oct. 21st, 1859, delivered to one Mundee, an article whereby, "in consideration of a certain promissory note, bearing even date with these presents, for $1,500, payable twelve months after date, executed in my [Brown's] favor by Chas. Mundee, and in further consideration of one dollar to me in hand paid by Chas. Mundee, the receipt whereby I do hereby acknowledge, have bargained, sold, and quitclaimed, and by these presents do bargain, sell, and quitclaim unto said Charles Mundee, and to his heirs and assigns, forever, all my right, title, interest, claim and demand, both in law and in equity, and as well in possession as in expectancy of, in and to" the lands, describing them. It was alleged that the article was intended as an agree-

ment to convey, and that the parties intended Brown should retain a lien for the payment of the note; that said writing, unacknowledged, was recorded Dec. 5th, 1859, in the register's office of the county. Mundee gave his note, and mortgage on the same lots, to Simpson, defendant in error, Jan. 3d, 1860; Mundee became insolvent, and neglected to pay either the note given for the purchase price of the lots, or the note to Simpson. Simpson commenced action to foreclose. Brown was made a party on his own motion. The question came up on demurrer to Brown's amended answer.*

*Clough & Wheat,* for plaintiff in error.

*A. F. Callahan,* for defendant in error.

For plaintiff in error, it was submitted:

1. Brown had a lien for the amount of the unpaid purchase money on said lots, against Mundee, and Simpson also, if Simpson took his mortgage with either actual or constructive notice that the purchase money was unpaid. (*Mackrith* v. *Symmons,* 1 *Leading Cas. in Equity,* 336, *and cases there cited; Dart's Vend. and Pur.,* 119, *note and cases there cited; ibid,* 345, *and cases there cited;* 17 *Ohio,* 519; 23 *Penn. St.,* 186; 21 *Vermont,* 271; *Neas's Appeal,* 31 *Penn. St.,* 294; 3 *Russell,* 488; 1 *Kansas,* 293.) Which lien Brown is presumed to have intended to retain. 2 *Equity Digest,* 243, §291; 1 *L. Cas. in Eq.,*

---

*The importance of the questions involved in this case, and the fact that counsel appear to have reviewed the decision of these points in a former case [3 Kans., 172], seem to warrant a fuller report of the facts and arguments than, under other circumstances, would be excusable.                                                            REP.

363; *Dart on Vend.*, 345, *note*; 17 *Ohio*, 519; 2 *Ohio*, 385; 17 *Eng. Law and Eq.*, 457.

2. We claim that inasmuch as neither Mundee nor Simpson, except, and only through, said writing from Brown to Mundee, had any title to said lots, and as that showed the debt, and that the purchase money was not paid, that by reason thereof (and without regard to the recording laws,) the law gave notice to Simpson of the contents of said writing, and that the purchase money for said lots was unpaid. A purchaser is presumed to investigate every instrument forming a link in the title he buys, and has notice of the contents of all of such instrument. 1 *Story's Eq.*, 420, *note* 3; *id.*, 435, *note* 3, § 393, *note* 4, § 400; *Jackson and Wife* v. *Rowe*, 2 *Sim. & Stu.*, 472–475.

3. If an instrument in the chain of title under which a person *claims* or *buys* land, shows the lien, then such person has, therefrom, notice of the lien; the law gives a purchaser notice of the title he buys, and of its defects, and of the liens thereby created. (3 *Howard*, 333, 410; 1 *Ohio S.*, 119; 22 *Ills.*, 605; *Walker's Ch.*, 462; 7 *Paige*, 421, 591; 2 *Ch., Cas.* 246; 13 *Missouri*, 13; 17 *Penn. St.*, 433; 20 *ibid*, 236; 14 *B. Mon.*, 277; 9 *Indiana*, 490; 23 *Texas*, 649; 14 *ibid*, 318; 6 *B. Mon.*, 67; 2 *Eq. Dig.*, 663, § 283; 14 *U. S. D.*, 581, § 27; 24 *Miss.*, 208; 14 *U. S. D.*, 580, § 8; 4 *Rich. Eq.*, 105; 8 *U. S. D.*, 259, § 82.) Notice of an instrument, is notice of the contents thereof. (*Cases above cited and* 2d *Eq. Dig.*, 663, § 283; 3 *Iredell*, 535.) A purchaser of land buys at his peril, and is bound to look to the title, and the competency of his vendor, and can get no more rights than have been in his vendor. *Cases above cited and* 1 *Johnson's Ch.*, 566; 1 *Kansas*, 302.

4. Constructive notice of a lien is sufficient to preserve and maintain it. (14 *B. Mon.*, 277.) Whatever puts a party on inquiry is notice. 2 *Eq. Dig.*, 663, § 260, 264, *and ibid*, 369, §§ 2, 3 ; 10 *U. S. D.*, 314, §§ 92, 95 ; 1 *Texas*, 326 ; 15 *U. S. D.*, 555, § 8 ; 14 *Ark.* (1 *Barb.*), 69.

5. It was not necessary for Brown to sue for the debt before enforcing his lien. (1 *Leading Cas. in Eq.*, 366–7; 2 *O.*, 394 ; *Barker* v. *Smark*, 3 *Beavan*, 64–5 ; 17 *O.*, 519 ; 2 *Gilman*, 327 ; 18 *Yeager*, 186'; 5 *J. J. Marshall*, 323 ; 1 *Dana*, 576 ; 1 *J. J. Marshall*, 212.) If Brown, knowing of this suit, had stood by without setting up his lien, and allowed a sale to be made by the sheriff, on foreclosure of Simpson's mortgage, he would have been estopped from ever thereafter claiming such lien against the purchaser. Brown would have waived, if he had stood by and seen. *J. J. Marshall*, 212.

6. Vendor's lien may be treated as a mortgage, and the general rights and remedies incident to it, are substantially similar to those created by an express mortgage. 1 *Hilliard, on mortgages*, 614, §§ 1, 2.

We are aware that this court has, in this controversy, decided that there is no such thing in this state as a vendor's lien for unpaid purchase money after deed executed; as that decision is in clear conflict with the law of England, as it was in force in the fourth year of James the First, we submit that it is not law within the definition thereof, as given in 1 Blackstone's Com., 44, 54, 56, 63, 67, 68, 69 and 71, and should therefore be overruled. (26 *Ills.*, 392 ; *Greenleaf's Overruled Cases*.) Some speak lightly of the vendor's lien, as though it was "an impalpable entity, of protean quality, with such an ethereal essence that

no man can graphically describe it." We do not claim that it ever could be seen by the natural eye, like a thunder cloud filled with lightning, or be felt in a balance of dead weights, like a stone or piece of wood, any more than any other rule of law which secures to any of us any of our rights ; law is an object, or matter of understanding and effect, not of size or shape ; nor is any description thereof more accurate than that which tells its effect—in cases where it gives a right, or secures a remedy ; that is enough. If the vendor's lien of England, which we claim we acquired with such other of her laws as were adopted, hath as much of substance as any other matter secured by law, that is enough ; the parties entitled thereto, by a series of decisions extending through centuries, appreciated its only tangible force and effect upon matters, when by its aid they received their pay for property which they had sold. In this case, by depriving the plaintiff in error of it, if he shall fail on his other claims therefor, he will lose these four lots, and all he was to be paid therefor, notwithstanding all who have become interested therein, acquired such interest with full knowledge of the fact that he had not been paid therefor. It is claimed that the general policy of our laws is against allowing vendors to have a lien for their purchase money. We cannot understand how this can be, when by express act of the lgislature, it was, in February, 1859, enacted that "The common law of England, and all statutes and acts of parliament in aid thereof, made prior to the fourth year of James the first, and which are of a general nature, not local to that kingdom, and not repugnant to, or inconsistent with, the constitution of the United States, and the act entitled 'An Act to organize the

Territory of Nebraska and Kansas,' or any statute
law which may from time to time be made or passed
by, &c., shall be the rule of action and decision
in, &c.''

Relying on the law about vendor's lien, as then sup-
posed to be in force therein, any one might well have
contracted and made his deed in reference thereto, at
the time Brown sold these lots, and by inserting a de-
scription of the note given for the lots, as in said wri-
ting, have been confident that even if the law-making
power should, by statute, abrogate so much of the
former law as gave a vendor's lien, the courts, as to
contracts already made, would enforce his lien for the
purchase money.    It is not claimed that a secret trust
can be enforced (it never was good), except as against
the trustee and persons taking under him with notice.
There is nothing secret or hidden about vendor's liens.
What could be as to the lots in controversy more pub-
lic or better calculated to give notice of the non-pay-
ment of the purchase money, than the statements made
in said writing?    We submit that sound morals and
good faith require that a man's property be not taken
for private use of another individual without compen-
sation; at least, when by so doing old rules of law are
abrogated without legislative sanction.    Simpson nev-
er claimed to have any greater right than Mundee, to
these lots; his mortgage was only on Mundee's inter-
est, and shall it be said that, in opposition to the long
series of decisions to that effect, a person who, in
1859, as our law then stood, made the writing above
set forth, thereby lost all liens on, and rights to, the
property sold?  If so, what rule of the law, as it is
admitted to have existed in England, can be relied on
for the protection of the citizen in the most common

matters? One judge may think this rule against policy, another may abrogate some other rule; and as to such matters see citations above made to Blackstone's Commentaries.

We have looked in vain for one or more statutes which conflict with the law giving a vendor's lien. Such rules of the common law about real estate as the legislature wished to have changed, it changed by the act concerning trusts, &c., the conveyance, marriage and other acts, but in none of them has it been said that a vendor should not have a lien, and if we should ask for a showing of which of our statutes have the effect claimed on such liens, which of them could be pointed out as even tending that way? With all respectful deference for all who differ with us, we submit no one will venture to specify which particular words, or sections, or chapters of our statutes have such effect. The learned gentleman opposed to us has failed to show any such statutes, nor can he successfully refer to any such policy of our state, or of its people, excepting always those who flourished a few years since by using and enjoying, contrary to former law, what they had not paid for, which reflects in the least against our claim. We submit it is founded in equity and good conscience, and ought to be enforced. As part of our argument, we refer to the case of Manly *et al. v.* Slason *et al.*, 21 Vermont, 279, 280; from which pages we make the following extract from the opinion of the court, which in that case enforced a vendor's lien :

"That the existence of these liens is inconsistent with our registry or attachment laws, is an objection no more formidable than exists from the same source against most constructive or implied trusts and liens, existing in or growing out of the numerous equitable

rights peculiar to real estate, and which have never-
theless been regarded and enforced in this state, upon
the settled principles of the English chancery.   An
absolute deed of land, with a parol defeasance for the
security of a debt, is of this character.   So are all re-
sulting trusts, in favor of the person paying the con-
sideration money for a deed of land, executed to some
third person.   And this right has been enforced in
favor of a married woman even (Pinney *v.* Fellows,
15 Vt., 525), where the whole subject of resulting
trusts is very elaborately and satisfactorily discussed,
and the authorities bearing upon that point learnedly
digested by BENNETT, J.

"Any argument, which is attempted to be drawn
from the statute of frauds, is equally applicable to the
English statute.   But many cases, coming, in terms,
within that statute, have been saved from its operation
by courts of equity.   Such are cases of part performance
of the contract, the deposit of title deeds, to secure a
debt, &c.   The payment of the price of land before
the execution of the conveyance, and the execution of
the conveyance without the payment of the price, as
well as the execution of an absolute deed for the secu-
rity of a debt, are all resulting trusts, and many others
are of this character.   It has been urged that the ex-
istence of such a lien will unreasonably clog the free
circulation of property, and that it is otherwise incon-
sistent with our habits of business and modes of con-
veyance.   But such an objection, if, indeed, it be
properly comprehended by the court, seems far too
uncertain and indefinite to form any just ground of
decision in a court of justice.   We, however, appre-
hend no serious embarrassment will result to the com-
munity from the determination here made.   This lien

can only be enforced in a court of equity, where all equitable considerations will be open to both parties. The cases will be few, and to entitle the plaintiff to redress, he must show a case of manifest equity, in proof and in principle. In my judgment, such a rule is far less in danger of being abused to the public det-- riment, than are stringent rules of law, enforced with an iron hand, through fear of relaxation. But I am not specially fearful of the abuse of the law, from rigid adherence to principle, as evolved from the decided cases.

"There is, in our day, perhaps, more danger of too great and sudden departure from the ancient land-marks of the sages of the law, which have been long tried and become easy and comfortable, in pursuit of the *ignes fatui* of modern progress and innovation. We should not have felt called upon to say anything upon this portion of the case, had it not been for the great zeal and evident sincerity with which these considerations were pressed upon the court."

Neas's Appeal, 31 Penn. S., 293–4, was an appeal by Daniel Neas, from the decree of the common pleas court of Berks county, to the supreme court of Pennsylvania, distributing the proceeds of a sheriff's sale of the real estate of Frederick Ream. Among the facts of this case, it was shown that Mary Baker, on the 12th day of November, 1849, conveyed to Frederick Ream, the premises out of which the fund in dispute arose, by a deed of that date, the consideration whereof is described as follows: "For, and in consideration of the sum of one thousand dollars, one hundred dollars whereof are to be paid annually, until the whole be paid, without interest, unto the said Mary Baker, during her natural life, and after her death to be paid to Elizabeth

Anderson, intermarried with John Anderson, lawful money of the United States, to her in hand, well and truly to be paid by the said Frederick Ream, in sums as aforesaid, and after her death as aforesaid."

After the death of Mary Baker, John Anderson and Elizabeth his wife, on the 19th day of February, 1855, assigned their interest in the unpaid purchase money to Dr. D. L. Beaver. On the 15th day of January, 1855, Frederick Ream, mortgaged a part of the premises to Daniel Neas, the appellant, and the land having been subsequently sold by the sheriff, under executions against Ream, the proceeds of sale were claimed by Dr. Beaver, under his assignment, and by Daniel Neas, under his mortgage. The court below decreed the whole amount of the unpaid purchase money to be paid to Dr. Beaver; and from this decree the appeal was taken by Neas.

The opinion of the Supreme Court was delivered by LOWRIE, C. J., in the words following: "The conveyance of Mrs. Baker to Ream is evidently a bungling filling up of a printed form of a deed, so as to express a mode of conveyance for which the form was not intended; but still there is no difficulty in understanding the transaction. It is a conveyance of land for the consideration of $1,000, to be paid in yearly installments of $100 each. On one side it is an executed conveyance so as to pass the title, and on the other it remains executory for the payment of the money.

"Does the consideration money remain a lien on the land until it is paid? This is simply a question of interpretation. How did the parties intend it, and how ought subsequent purchasers to understand such a form of conveyance?

"It is a conveyance to Ream, his heirs and assigns,

for a consideration to be paid, and no one could reasonable suppose that he could buy from Ream, clear of this duty of payment. It is, therefore, a charge on the land, and stands in the title. When the law sells it, it discharges the lien, and pays it off."

With this common-sense view of the subject, our decisions agree. 8 *Watts,* 392; 7 *ibid,* 144; 5 *State R.,* 418; 20 *ibid,* 236, 240; 23 *ibid,* 39.

"It is not necessary to declare expressly that the money is to remain a lien, when the intention is otherwise clearly manifest in the conveyance. The other exception was properly abandoned.

"Decree affirmed at the appellant's costs."

We submit that Brown's writing was, at least in part, executory. *See, also,* 5 *Wendell,* 26.

*Callahan* submitted for defendant in error.

The case at bar has already been before this court, on precisely the same points now made by the plaintiff in error. It was elaborately argued by counsel, and discussed in all its bearings, and upon all its merits, at the February term, 1865, and decided. With a pertinacity of perseverance not equaled since the days of Jarndyce, it comes back, lugging the tattered and threadbare issues, so often passed upon, and hurling them with all its unspent force, not at the opposite party this time, but in the very teeth of the court.

1. The court decided in the case of Marcus D. L. Simpson *v.* Warren Brown *et al.* (*see* 3 *Kansas Reports, p.* 172), that "the doctrine of vendor's lien, as administered in England, does not arise out of the contract of the parties, nor result from the operation of the law, but is the mere creature of the court of equity,

breathed into existence independently of original intention of the parties." "The court is of the opinion that the law of vendor's lien, as administered in England, is not necessarily a part of the law of this state. That, being repugnant to the general real estate jurisprudence of the state, as contemplated and established by statute, a recognition of its existence here would savor more of legislative than judical determination. Hence, it cannot and should not be regarded as part of the law." Reference is made to the brief of W. P. Gambell, set forth in the above case.

2. The sale was not made in consideration of money to be paid at a future date, but in consideration of the payment of one dollar, and the delivery of a promissory note. The deed, in express terms, negatives the idea that the vendor intended to retain a lien upon the property.

3. The vendor, by making a full and complete deed, and accepting the note, has agreed to trust to the personal credit of the buyer. (1 *Cox R.*, 94.) The lien ceases when anything is taken in satisfaction of the price. 1 *Cox R.*, 100 ; 15 *Ves.*, 344 ; *Hagerty* v. *Palmer*, 6 *Johns. Ch. R.*, 437 ; *Cowell* v. *Simpson*, 16 *Ves.*, 278.

4. Where the vendee was considered good at the time of sale, and a personal credit was given him, any notion of a lien is thereby excluded. This is to be judged by all the circumstances of the case. The giving of a note for the price was deemed, at the time of sale, equivalent to payment. Lord Eldon, in Mackreth *v.* Symmons (15 *Ves.*, 340), speaking of the difficulty in determining what circumstances are to be deemed sufficient to repel or displace the lien, it being left in such a state of embarrassment by the authorities, says, that "it would have been better at once to

have held that the lien should exist in no case, and that the vendor should suffer the consequences of his want of caution." A vendor selling lands and conveying them in fee, and taking a note for the purchase money without taking a mortgage, has no implied lien on the land, so as to give him any preference over the other creditors of the purchaser. *Wragg's Rep's* v. *Comptroller Gen.*, 2 *Desau.*, 509.

5. The judgment for the sale, and the confirmation of the sale, were all proper and right, in any view of the case. The plaintiff in error allowed the confirmation to be made, and money to be distributed, without exception. No reversal could be had, in any view, except on the part of the judgment as to priority; which would leave the official making the sale in the position of having settled with the parties, in pursuance of the judgment, and being again asked to pay to other parties. The sale was made, and the confirmation entered, without objection or exception, and the property has gone into the market as the property of the purchaser at that sale. A reversal of this judgment would, therefore, work grave injustice and hardship to all parties who have purchased and conveyed on the faith of that sale.

6. Stability and certainty in the law are of the very first importance. Hardships may sometimes result from a stern adherence to general rules. If judicial decisions are subject to frequent change, it would disturb and unsettle the great landmarks of property. 1 *Ohio St.*, 110.

7. The decisions of the highest judicial tribunal of the state, in questions affecting rights of property which becomes valuable and changes hands upon the faith of such decisions, will not be disturbed without

the most urgent necessity, to prevent injustice or vindicate obvious principles of law.    1 *Ohio St., p.* 362 ; 2 *id.*, 36, 44, 373, 380 ; 3 *id.*, 501 ; 5 *id.*, 251 ; 11 *id.*, 284–288 ; 14 *id.*, 260, 269, 488.

8. If any judgment or judgments, in satisfaction of which any lands or tenements are sold, shall at any time thereafter be reversed, such reversal shall not defeat or affect the title of the purchaser or purchasers ; but in such case, restitution shall be made by the judgment creditors, of the money for which such lands or tenements were sold, with lawful interest from the day of sale.    *Comp. L., p.* 202, § 458.

*By the Court,* BAILEY, J.

We have carefully examined the very able argument of the counsel for the plaintiff in error in this case, and have been forcibly impressed with the similarity of his views with those of the learned counsel, in the reported case of Simpson *v.* Mundee *et al.* (3 *Kas.*, 172), and for the reasons given at length, in the opinion of the court, in that case, the judgment of the court below, in this case, will be affirmed.

All the justices concurring.